20-1065 from the District of North Dakota, Northern Bottling Company, et al., v. PepsiCo. Good morning, your honors. Good morning. Ms. Gray, we'll hear from you first. Thank you. May it please the court, my name is Kyle Gray, and I represent Northern Bottling, an independent, exclusive distributor of Pepsi products in areas of North and South Dakota under a series of exclusive bottling appointments, which are, we shorthand, EBAs, that were issued over decades. This dispute is controlled by two bedrock principles of federal jurisprudence that require reversal for a jury trial here. And the first is the venerable Erie Doctrine. We all learned about it in law school, and I'm sure your honors have as that doctrine was expanded by the Supreme Court in its 1990 Salve Regina decision, the courts in a diversity case like this, where state law is being applied, are to seek to promote the goals of doctrinal coherence and cooperative federalism. And that generally means that the circuit courts, they decide Erie issues like this as to what law the highest court of a state would apply, and here it's New York law, since all of these EBAs across the country and indeed across the world have New York choice of law clauses in them. But the question is, does New York common law apply or the New York UCC? And this court has the guidance from the Tenth Circuit, which in 2005 decided an issue on all fours saying that these contracts, because they involve, they have service and sales components, but the sales are not at all it's a sale to get the part, the material from Pepsi that then makes the Pepsi product, and then it is also the largest part of the contract that requires the bottler to distribute the product to as far as it can to all areas within its territory. And so... Counsel, would you agree that notwithstanding the Pittsburgh case, that we do have to look at the predominant purpose test independently of these facts? Yes, but it's the test of New York. And New York, as we set out in our brief, has looked at this under both the old Sales Act, which was the law before the UCC, and now in a recent 2019 case that we cited to the court, and the purpose there or the test there is, are the sales incidental? And that's what the Tenth Circuit looked at, that there was no way here to a distributor contract that you could conclude, at least as New York looks at its law, that the sales are incidental to this contract. Is the question whether the sales are incidental or whether the services are more than incidental? And that's a good question, Your Honor, because the district court got that wrong. It relied on the Alisaia case that was interpreting a Saudi Arabian contract, and it said the test is, are the services incidental? And in fact, if you look at both what the district, what the Tenth Circuit said, and also what the Perlmutter case, which is the original New York case out of the highest court of New York, the question is, are the sales incidental? And in that Perlmutter case, what happened was you had a hospital contract where part of that contract for surgery was that blood would be purchased. And the court there said, well, because that sale of blood was really incidental to the overriding part of that contract, which was to have surgery, it would be incidental. And so it was a services contract rather than a sales contract. But every other one of these decisions out of the New York intermediate courts, which, of course, the Erie Doctrine and the Salve Regina Doctrine, and this court's own precedent require it to look at the law that comes out of both the intermediate courts and the highest court of New York, the Court of Appeals, all of those talk about the sales have to be incidental, and if they are not, then a contract is a sales contract, not a services contract. And in the later jurisprudence, the New York courts also talk about the fact that the emphasis is towards sales rather than service because the UCC is a uniform act. The purpose behind that act is to require courts to apply uniform law across lots of different commercial conduct. And so that's why, when there's a question, under New York law, you call it a sales contract, not a services contract. And that's, in fact, where the district court went wrong. And again... Counsel, regardless of whether we're under New York common law or New York UCC law, there is an implied covenant of good faith and fair dealing implied into the contract here. What I'd like to have you address is whether there's any evidence in the summary judgment record of a breach of that covenant of good faith and fair dealing, and if so, what is it? Sure, there's a lot of it. It goes to the breach of the contract itself, the reasonable steps duty, and as the Tenth Circuit said, you kind of breed the covenant of good faith and fair And the evidence is that Pepsi took over 80% of the market for itself and made no changes in its enforcement program to deal with the fact that the transshipment, both all through the and that Pepsi did nothing to deal with that. And if you'll look at the expert report... Counsel, the problem I'm having and something I'd like to have you address is, it seems to me there's a conflating here of some sort of affirmative duty to prevent all transshipments, on the one hand, and a duty not to take some act to deprive Northern of the benefit of its bargain. I think those are two very different things. So what the Tenth Circuit said, Your Honor, is that because of what happened in the course of performance of the parties over the years, that they were reading a reasonable steps duty into the contracts, reasonable steps to prevent transshipment. Now, obviously, you're not going to prevent all of it, but it's to put good faith efforts in and try to prevent it when it's happening, which here it's very clear it was. And if you go back and look from the very start of these contracts, you have the facts that they are exclusive territories and Pepsi itself, first, it went to Congress to get a law passed so that it could keep exclusive territories that otherwise were going to be found violative of the antitrust laws. And then it told its bottlers that they had to follow this. They could not engage in any conduct that would breach this understanding that there was to be no transshipment, indirectly or directly. Counsel, that's what I'm looking for, is what evidence is in the record of any conduct on the part of PepsiCo that would have breached this covenant of good faith and fair dealing? Did they knowingly ship a product into their territory? What is the evidence that they breached this? So they knowingly shipped evidence or they knowingly shipped, they knew that transshipment had gone way up. And it had gone up, I think the magistrate said the numbers were like 90% of the transshipment came not from the remaining independent bottlers, but from the Pepsi-owned bottler. And Mr. Lewis, who is the general manager of the field manager for Pepsi, testified that the TEP, the enforcement program that Pepsi itself had found it had a duty to enforce, was no longer working, given that the transshipment had gone so far up, because there were these newly Pepsi-owned bottling companies were producing so much more than they had been earlier. And so, so much more was coming out into what the magistrate called gray markets. And it sloshed around in the gray markets and then was being bought and sold into the exclusive territories of northern bottling. And so there's the evidence that in 2014, the amount of cases that were found in the exclusive territories of northern bottling were about 30. And these are the tip of the iceberg of what you find, but it's a general idea of how much transshipment is going on. And then by 2015, it was 6,500. So it was just an incredible increase. Is there any evidence that Pepsi did not enforce its TEP program? Well, Pepsi admitted its TEP program was no longer working. That's in Mr. Lewis's testimony. And it enforced it in the sense that it enforced it as things were circa 2005, when the 10th circuit was looking at this issue. But it has not enforced it in the sense that it doesn't work anymore. And that is the issue that both... Is there any evidence that Pepsi was aware of transshipments and did nothing? Yes. I mean, they were aware that the cases that are found are only a tip of the iceberg. It knew by virtue of the huge numbers of what was being transshipped that there were more cases that were in northern's territory. So the TEP itself only shows a very small blip of what is going on that is a problem for the exclusive... But the number of transshipments that you're looking at are only those that were dealt with under the TEP, right? No, that's not true, Your Honor. That's the cases that were found, that are discovered under the TEP. But if you look at the numbers, and they're set out in Mr. Langer's deposition, they're also in several other places in the record, there were just these huge numbers of transshipment that was going around the country. And Pepsi knew it. And Mr. Lewis says they were trying to fix this. They knew it was a problem. But they weren't doing the things that our expert, Mr. Cook, said they should be doing to stop this. And that is undisputed, that we put the expert report of Mr. Cook into the record, where he set out what it was Pepsi should be doing to meet its reasonable steps duty. And it simply wasn't doing those issues like having the know your customer program, like increasing the fine. Even if you get UCC application here, and you argue they have to take reasonable steps, don't you have to show that that was the course of dealing that they had to take, that in the past they were taking reasonable steps to prevent transshipment, as opposed to simply enforcing the TEP? They were taking reasonable steps, your honor, until 2015. Other than the TEP, is there evidence of course of dealing of other reasonable steps? Sure. There's all the letters from Pepsi to its independent bottlers saying, look, you need to not sell into these other markets. You need to not sell the others you know are selling into exclusive territories. And Pepsi didn't do anything to enforce that for a while. And in fact, there's some evidence about Cormark, which was a problem business that was buying up the transshipment, the transshipped product, and then selling it to Northern's customers. And Pepsi told Cormark it had to knock it off, but then it backed away and it wouldn't take away its and did very little to fix it. And you can see from Mr. Lewis's testimony that they knew it was a problem, and they were looking at ways to try and fix it, but they did not do what our expert Mr. Cook said should have been the practices that they were following. And those are the kind of issues that go to a jury, a jury deciding what is reasonable. And New York law, particularly under the UCC, it's very clear that it is the duty of Pepsi to act reasonably, and that under New York law, that question, whether they did or not, is for the jury, not for the court to decide. Your Honor, I'm having a problem. I'm not seeing the clock on my screen. I see. Your time has expired. So I'm sorry. Could I have a minute on rebuttal? We didn't have a chance to talk about SEPSA, and the one thing I wanted to point out to the court is that came down after the briefing here, and so I suspect the court probably will want to hear something on that. And I'm sorry, I just didn't have the clock in front of me. Okay. Very well. We'll consider that after we hear from the appellee. Thank you for your argument. Thank you, Your Honor. Ms. Hemrick, we'll hear from you. Thank you, Your Honor. My name is Sondra Hemrick. May it please the court, I'm here this morning on behalf of the Appellee PepsiCo Inc. And I would like to start by addressing some of the statements that were made by Northern's counsel in her argument. First, starting with Derek Lewis, Mr. Lewis's testimony. Mr. Lewis did not testify that the transshipment enforcement program was not working. That's just a misstatement. That was part of the question that Northern's counsel asked, and Mr. Lewis did not agree with the statement that the transshipment enforcement program was not working to prevent transshipment. In addition to that, Mr. Lewis testified about the transshipment enforcement program and the complexity of stopping transshipment, specifically in the context of transshipment in the northeastern part of the United States, which it is undisputed, is where the vast majority of transshipment occurs. What did Lewis say then? I thought Lewis said that the program needs work and there's no doubt we need to improve it. He did say both of those things, and he was talking specifically about unique characteristics that don't apply here. That's important for another statement that Northern's counsel made, which is the suggestion that somehow the transship cases that were found in Northern's territory is just the tip of the iceberg. She referred to vast quantities of transship product. Again, the vast majority of the transship product is in the northeast, not in Northern's territory. In addition to that, the transshipment enforcement policy allows the bottler to have investigators come out and look in their customers' stores as often as they want. They can have the investigators come every day to every single store in their territory if they believe that's necessary to find the transshipped product. The idea that somehow there's lots and lots of transshipped product in Northern's territory that just wasn't found, there's just no basis for that. That's completely contrary to the way the program works. It's contrary to the evidence. There is no such evidence. I also want to go back to another question that I think it was Judge Graz who asked, or perhaps it was you, Judge Grunder. Is there any evidence here that PepsiCo did nothing? Of course, that's absolutely not the evidence. The evidence here, unlike in the Pittsburgh case significantly, is that PepsiCo adhered to and followed the transshipment enforcement program to the letter. Every single complaint that Northern submitted was investigated. The fines were assessed. The investigation costs were assessed. The fines were paid over to Northern. Northern's witnesses testified that they were satisfied with the enforcement of the program with respect to its complaints by PepsiCo. Counsel, as I understand it, there's an allegation that PepsiCo continued doing business with Culinary Ventures and Vistar who were transshippers. There is no evidence in the record, and I believe actually the evidence is to the contrary, that Culinary Ventures or Vistar were responsible for any transshipped product in Northern's territory. There's no evidence that either of those entities transshipped any product into Northern's territory. There's no evidence that either of those entities sold any product to Cormark that was transshipped into Northern's territory. Now, going back to what PepsiCo and PBC said, that PBC and PepsiCo were able to identify as a result of discovery in this case as having been sources of material amounts of PepsiCo product that ultimately ended up in the hands of Cormark and got transshipped into Northern's territory. Again, it's important to remember that those customers, even those three customers, they didn't sell the product to Cormark. PepsiCo didn't sell the product to Cormark, PBC didn't sell the product to Cormark, and PBC's customers didn't sell it to Cormark. This is product that Cormark bought on the open market after it changed hands three or four times after leaving PBC's control. Even in spite of that, when PBC and PepsiCo were able, through discovery in this case, to identify three specific customers as having been sources of material amounts of the product that was ultimately transshipped into Northern's territory, they took action. PBC suspended sales entirely of the relevant CSDs to one of those customers, sorry, CSDs, carbonated soft drinks, and cut the sales of those products by 50% to the other two. They did that at a cost to PBC of millions of dollars in what would have been legitimate sales to those customers within PBC's territory. They did that. They lost all that money because it was important, and it continues to be important, for PBC to impress upon its customers that transshipment is not allowed and won't be tolerated. By the way, PBC lost all that money taking these actions against these customers in order to stop transshipment to four of Northern's customers. There were four customers. That was it. Out of over 2,000, this was a tiny, tiny fraction of Northern's business and Northern sales. Nevertheless, PBC took those actions. I would also point out that PBC took those actions pursuant to its own internal anti-transshipment policy that it put in place in 2010, and it's policy, as we detail in our brief, includes many of the things that Northern's expert John Cook said PepsiCo should be doing and PBC should be doing to stop transshipment. PBC and PepsiCo are doing many of those things, which apparently Mr. Cook did not recognize. All right. If no further questions on that, I did want to move to a couple, if I could address the UCC issue. First, with respect to what New York law actually says, and this was really a theory that Northern seems to develop in its reply brief in front of this court, that somehow New York doesn't follow the same predominant purpose test as other courts in terms of applying the UCC to a mixed contract. That's just a misreading of the cases. I would point in particular to the fact that what the Tenth Circuit, here's what the Tenth Circuit said about New York law on this issue in the Pittsburgh case. They said, under New York law, a contract is won for service rather than sales when service predominates and the sale of items is incidental. Conversely, a contract must be considered won for sales when services are merely incidental or collateral to the sale of goods. It's the same predominant purpose test. What's the prominent purpose? What are the services? What are the sales? Are the sales incidental and collateral, or are the services incidental or collateral? What if neither is incidental or collateral? As I read the cases, I don't see the New York court or the New York law stating that in that case you err on the side of it being a sales contract. What's the best New York case that spells that out? We've been cited the Tenth Circuit. We've been cited the federal court in New York. What's the best case from the New York courts that would spell out how to handle a sales contract? Not a federal case. I think there's very little actually on that particular issue from the state courts of New York. We have federal cases, including, for example, the old country Toyota case. Right. I'm familiar with that. I'm familiar with Al Yassini or however you say it. Since we're talking about New York law, I thought you might point us to the best case if there is one. There is one, Your Honor, and I need to identify it quickly if I could because the name is escaping me at the moment. Well, if you don't have it at the ready... I'm afraid I don't, Your Honor. I will have to find that and I'm happy to supplement the record or send a 28-day letter if the court would like that. No, I thought if you had one on mind, then you could let us know. We have the briefs. Of course, and all the cases are, of course, cited there. But again, I don't think your court actually needs to answer that question here because this is not a case where you've got a contract that is evenly balanced between services and sales. If you actually look at the specific facts and terms of the EBAs, the way that the courts in the Al Asayi case and the Coca-Cola Bottling Company of Elizabethtown did, if you actually look at those terms, which is what you're supposed to do and which, by the way, the Pittsburgh court didn't do, but if the court actually carefully analyzes those terms, it's clear that the services are predominant here. In particular, I would note that- How can you say that the sales are merely incidental? Because, Your Honor, as Northern's counsel stated in her argument, she said that the essence of these EBAs is for the bottlers to get the material, its concentrates from PepsiCo, and then make the Pepsi product that they then distribute. That making, that bottling of the product is the central thing that the bottlers have to do. That's why the contract contains provisions about having a clean and sanitary bottling plant and building more bottling plants if necessary. If the bottlers don't perform that service, then all you've got essentially is you got some concentrate, you got some water, you got high fructose corn syrup, you got some empty bottles. You have nothing to sell. The essence of the EBAs is the creation of, is the building of plants and then the creation of the product, the manufacture of the product so that it can be sold. Is part of the EBA that it would be sold after it's created? I'm sorry, Your Honor, what did you say? Is part of the EBA, does the EBA contemplate that the bottler would sell the product after it's created? Yes, it certainly does. So it contemplates the sale of the syrup and so forth to the bottler, contemplates creation of the product by the bottler, and it contemplates creation or sale of the product by the bottler. And you said it makes sale incidental to the contract? I would say that it is, Your Honor, and that's certainly what the court in, for example, Al-Isa'i found looking at a virtually identical provision. If you look at the Al-Isa'i case, what the court did was, I mean, and I'll actually read the key provision the court focused on. The provision of the agreement said, the bottler agrees to establish and commence operation of a plant for the production of Canada Dry beverages at bottler's expense, no later than July 31, 1969. When the demand for Canada Dry beverages in the territory shall necessitate additional facilities, the bottler agrees to establish such additional facilities. And the court found that that paragraph in particular indicated that the purpose behind the agreement was the establishment of a bottling business by Al-Isa'i, not just the sale of extracts from Canada Dry to Al-Isa'i. But the test they were applying was whether the services were merely incidental, and they said the services were not merely incidental. So if that's the right test, then I understand the outcome there. But if the test is whether the sales are merely incidental, you might have a different conclusion. That's why I was wondering if there's any New York case that would spell out exactly what the analysis should be. I'm not aware of any New York case that says anything different than what the Second Circuit said in Triangle Underwriters and what the District Court said in Old Country, which is a contract is one for services rather than sales when service predominates and the sale of items is incidental. A contract may be considered one for sales when services are merely incidental or collateral to the sale of goods. Okay. Does it really matter to the ultimate outcome of this case whether we apply the UCC or New York Common Law? It does not, Your Honor. The only thing that applying the UCC really gets you is that it allows the court to look at the party's course of performance, even though the agreement is, as everyone agrees, unambiguous. The EBAs are unambiguous, but if the UCC applies, the court can look at the party's course of performance. Now, of course, course of performance may be used to explain or supplement. It can't be used to contradict the terms, but the important thing is what the party's course of performance shows is that PepsiCo, in order to address transshipment, created the Transshipment Enforcement Program. That's the course of performance. It's the creation of the Tenth Circuit relied on to find a duty. If the creation of the Transshipment Enforcement Program, that course of performance, creates the duty, then compliance with the Transshipment Enforcement Program necessarily satisfies the duty. They're coextensive. That's all the course of performance gets you and all the UCC gets you. Of course, here, it's undisputed. PBC complied with the Transshipment Enforcement Program to the letter. Thank you. Very well. Thank you for your argument. Just to remind you that even if you're on mute, you are on camera here, so it would be better to refrain maybe from conversation and so forth, if you could, while we're hearing from your opposing counsel. Ms. Gray, we had some problem with the clock, so we'll give you two minutes for rebuttal, if you'd like to respond. Yes. Thank you, Your Honor. I think it's important to recognize that there is New York law on point. There's not New York law on the issue, or from the highest court, whether New York would apply these contracts or apply the UCC to a distributor contract. That's the lower courts say that over and over again. But the highest court, the Perlmuter case, has explained what the test is, and the test is whether the sale is incidental. That's Perlmuter, which is a sales case, and then also the 2019 case in Ray Asbestos that we cite in our reply brief, that talks about that Perlmuter decision, how it's still good law, and how the court leans towards finding pretty much anything, a sales contract, if there is a sale that is not clearly incidental to it. And so those two cases under the Erie Doctrine really do control here. So with the UCC being applied, then we get to the reasonable jury standard. And the question becomes, is there enough evidence that Pepsi did not behave reasonably? And if just enforcing the TEP is enough, then they've allowed the TEP, as Mr. Lewis said, to not work very well. And so it really can't be enough under the question of, is Pepsi's conduct reasonable? Has it taken reasonable steps to deal with the reality circa 2020 that Pepsi now owns most of the market, and it has increased the distribution, and the gray market, as the magistrate talked about, is the problem here, and that Pepsi, that there's a question for the jury whether Pepsi has taken reasonable steps to deal with the 2015 reality. And again, I would point the court to the huge increase from 2014 of 30 cases being discovered to 2015 of 6,500. That just doesn't happen on of course, the reasonable jury test is, errs towards allowing these kind of cases to be decided by the jury, not by the district court acting as essentially as if there's a bench trial. And so those are the issues we think that the court should focus on. Very well. Thank you for your argument. Thank you to both counsel. The case is submitted, and the court will file an opinion in due course.